IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**GARY MCNEAL**                                          Case No. 1:19-cv-01072
c/o Zachary Gottesman
404 East 12th St., First Floor                          Judge Barrett
Cincinnati, Ohio  45202

       Plaintiff,                                **SECOND AMENDED COMPLAINT**
                                                        **WITH JURY DEMAND**
                                                        **ENDORSED HEREON**

vs.

**THE CITY OF BLUE ASH**
c/o Kirk Wall, Esq.
Dinsmore & Shohl
191 W. Nationwide Boulevard Suite 300
Columbus, OH 43215

and

**DAVID WALTZ**, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY AS CITY MANAGER
FOR THE CITY OF BLUE ASH
c/o Kirk Wall, Esq.
Dinsmore & Shohl
191 W. Nationwide Boulevard Suite 300
Columbus, OH 43215

and

**SCOTT NOEL**, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY AS CHIEF OF
THE BLUE ASH POLICE DEPARTMENT
c/o Kirk Wall, Esq.
Dinsmore & Shohl
191 W. Nationwide Boulevard Suite 300
Columbus, OH 43215

       Defendants.

       Plaintiff hereby amends his Complaint as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343 (2), (3), and (4).

2.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the claims derive from the same operative facts and are so related to Plaintiff's federal claims that they form a part of the same case or controversy.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants are residents of this District and are residents of Ohio. Further, the acts or omissions giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

4.      Plaintiff, Gary McNeal, is a male African American, former patrol officer for the Blue Ash Police Department, who had the validity of his termination upheld, and his grievance denied, by Arbitration on August 7, 2019.   At all times relevant herein, Plaintiff was over the age of 40.

5.      The City of Blue Ash is a municipal corporation organized pursuant to the laws of the state of Ohio, located in Hamilton county, and is the former employer of Plaintiff Gary McNeal.   The City of Blue Ash employs over 50 persons.  Defendant Blue Ash is a covered employer under the applicable statutes.

6.      David Waltz, is the City Manager for the City of Blue Ash and he is responsible for making employment and personnel decisions, including the decisions complained of herein.  Defendant Waltz is a covered employer or agent of an employer, under the applicable statutes.

2

7.     Scott Noel is the Chief of Police for the Blue Ash Police Department and he is responsible for making employment and personnel decisions and recommendations to the City Manager, including the decisions complained of herein.  Defendant Noel is a covered employer or agent of an employer, under the applicable statutes.

**FACTS**

8.     In September of 2018, Plaintiff has served the City of Blue Ash for 17 years as a police officer and had a total of more than 33 years' experience in law enforcement.

9.     Plaintiff also, at that time, was a participant in Ohio's Deferred Retirement Option Plan ("DROP"), which allows eligible police officers and firefighters the option to accumulate a lump sum of money for retirement on a tax deferred basis during their working years.[1]

10.     Starting in approximately 2016, and as Plaintiff continued in his employment at Blue Ash and neared retirement age, he began to receive systemic and heightened scrutiny and harassment over his employment actions as a Blue Ash Police Officer not suffered by younger officers under the age of 40.

11.     These actions were not suffered by non-African American officers as well. Plaintiff was targeted for reprimands and received disparate treatment in the handling of his infractions.

---

[1] More information on DROP is contained at https://ohioretire.com/understand-drop (last visited 4/1/2020) and https://www.op-f.org/retiredmembers/dropinforamtion (last visited 4/1/2020).  Participants must be at least 48 years old and have at least 25 years of service to be eligible.  DROP contributions can only be made for 8 years, and a participant must be enrolled for at least 3 years to obtain the full benefits of DROP.  DROP is costly for employers such as the Defendants in this case, but contains a valuable benefit for older police and firefighters nearing retirement.

12.     On September 20, 2018, Plaintiff filed a charge of race-based and age-based discrimination against Defendant.  A copy is attached to this Complaint as Exhibit A and the allegations contained therein are incorporated by reference.

13.     On September 19, 2019, the EEOC office, having investigated the complaint, issued a Right to Sue letter to Plaintiff.  A copy is attached as Exhibit B.

14.     In support of his claim, Plaintiff submitted supplemental materials in support of his claim. A copy is attached to this Complaint as Exhibit C and incorporated herein by reference.

15.     On June 26, 2018, Plaintiff responded to a radio dispatch involving a possible suspected overdose.

16.     A shift supervisor, Sergeant Edward Charron, a Caucasian and considerably younger officer, also responded to the same dispatch, and in a similar fashion as Plaintiff.

17.     Police Chief, Scott Noel, also responded to the same dispatch because, as he testified, there were concerns that both Plaintiff and Charron would not appropriately respond to the dispatch.

18.     Both Plaintiff and Charron travelled to the scene, from two different locations, without their lights and siren and arrived after Noel who had left the station at the same time as Plaintiff but exited the parking lot before Plaintiff.

19.     On July 5, 2018, Noel ordered an internal investigation concerning the response time and response mode of Blue Ash Police officers who responded to the call for service on June 26, 2018.

20.     The internal investigation identified two other officers with details and responses similar to Plaintiff's and occurring within the week following the incident which

is the subject of this Complaint. These two officers received no disciplinary action whatsoever.

21.     For all purposes, Charron, and the other two officers were, for all intents and purposes, similarly situated for purposes of discipline.

22.     In attempting to justify Plaintiff's termination, Defendants undertook a scrutinizing review of a variety of actions by the Plaintiff in the months preceding the termination action.  Similar scrutiny was not applied to Charron, the other two officers, or in actuality any other Blue Ash officer.

23.     On September 7, 2018, a report and recommendation were issued as a result of the internal investigation recommending Plaintiff be terminated.    This action was motivated by Plaintiff's age and/or race.

24.     It was not recommended that the other responding officer, Sgt. Charron, be terminated.   Again, no other officer, in any comparale situation, was subjected to the same scrutiny or same discipline, for similar actions.

25.     In a memo to City Manager David Waltz dated October 2, 2018, Chief Noel concurred with the factual findings of the report and recommendation that Plaintiff be terminated.

26.     On November 28, 2018 Plaintiff was issued a termination letter.

**COUNT I- DISCRIMINATION FOR MAKING CHARGES, TESTIFYING, ASSISTING, OR PARTICIPATING IN ENFORCEMENT PROCEEDINGS IN VIOLATION OF 42 U.S.C. SECTION §2000e-3**

27.     Plaintiff realleges the preceding paragraphs as if fully rewritten herein.

28.     42 U.S.C. § 2000e-3(a) provides in pertinent part that "It shall be an unlawful employment practice for an employer to discriminate against any of his employees… because

he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

29.     Defendants have discriminated and retaliated against Plaintiff by terminating his employment on November 28, 2018 because Plaintiff filed a charge of discrimination against them on September 20, 2018, has opposed unlawful employment practices, and participated in proceedings provided for under 42 U.S.C. § 2000e and its subchapters.

30.     The discrimination and retaliation complained of herein was intentional.

31.     As a direct and proximate result of The City of Blue Ash's unlawful, discriminatory, and retaliatory conduct, Plaintiff has suffered injuries and damages, including front pay, back pay, compensation for lost benefits including, without limitation, COBRA and DROP contributions, emotional distress damages, and is entitled to judgement and relief as provided under 42 U.S.C. § 2000e and its subchapters, including punitive damages under 42 U.S.C. 1981a.

### COUNT II- DISCRIMINATION ON THE BASIS OF ETHNICITY AND NATIONAL ORIGIN IN VIOLATION OF 42 U.S.C. SECTION §2000e

32.     Plaintiff realleges the preceding paragraphs as if fully rewritten herein.

33.     The actions of the City of Blue Ash, as outlined above, are discriminatory against the Plaintiff on the basis of his race, in violation of the above statute.

34.     The disparate and excessive punishment to Plaintiff was also discriminatory towards him, and constituted a hostile environment harassment, as those given less severe punishments for similar infractions were Caucasian.

35.     As a result and consequence, Plaintiff has suffered damages, to include emotional distress, loss of front pay, back pay, compensation for lost benefits including, without limitation, COBRA and DROP contributions, and, because at his age in this line of work, his loss of opportunity to retire with the City of Blue Ash and manner of termination, will taint his career for the rest of his life.

36.     The discrimination complained of herein was intentional.

37.     As a direct and proximate result of The City of Blue Ash's unlawful discrimination, Plaintiff has suffered injuries and damages and is entitled to judgement and relief as provided under 42 U.S.C. § 2000e and its subchapters, including punitive damages under 42 U.S.C. 1981a, believed to be in excess of $1,000,000.00 in front pay, back pay, emotional distress, and his reasonable attorney fees and costs.

### COUNT III- DISCRIMINATION ON THE BASIS
### OF AGE IN VIOLATION OF 29 U.S.C. SECTION 623

38.     Plaintiff realleges the preceding paragraphs as if fully rewritten herein.

39.     The actions of the City of Blue Ash, as outlined above, are discriminatory against the Plaintiff on the basis of his age, in violation of the above statute, 29 U.S.C. 623.

40.     The disparate treatment in regard to punishment was also discriminatory towards him, and constituted a hostile environment harassment, as the other responding officer, not terminated as a result of non-compliance, was younger.

41.     The age discrimination complained of herein was willful.

42.     As a result and consequence, Plaintiff has suffered damages, to include emotional distress, loss of front pay, back pay, and because at his age in this line of work, his loss of opportunity to retire with the City of Blue Ash and manner of termination, will taint his career for the rest of his life. 42.The City of Blue Ash is responsible for damages and is

liable under 29 U.S.C. 626(c), in an amount to be determined at trial, but believed to be in excess of $1,000,000.00, in front pay, back pay, compensation for lost benefits including, without limitation, COBRA and DROP contributions, emotional distress, liquidated damages, and his reasonable attorney fees and costs.

## COUNT IV- REINSTATEMENT INTO ACTIVE DUTY

43. Plaintiff realleges the preceding paragraphs as if fully rewritten herein.

44. The City of Blue Ash, should be ordered to immediately reinstate Plaintiff to his patrol officer position and to grant him such back pay as he would have received had there been no discrimination, in accordance with 41 U.S.C. 2000e et seq and/or 29 U.S.C. 626.

## COUNT V – R.C. §§ 4112.01, *et seq*.

45. Plaintiff incorporates the preceding paragraphs as if fully restated here.

46. In violation of R.C. § 4112.02(A), Plaintiff has suffered illegal discriminatory treatment affecting the terms, conditions, and privileges of his employment because of his race and age.

47. Specifically, Plaintiff has been subjected to a hostile work environment, abusive and demeaning verbal attacks, and have been transferred or otherwise suffered adverse employment decisions because he is African American.

48. As a direct and proximate result of Defendants' unlawful, discriminatory, and retaliatory conduct, Plaintiff has suffered injuries and damages and are entitled to judgment and relief.

49. Under R.C. § 4112.99 and R.C. 4112.051, Plaintiff is entitled to recover damages, including punitive damages, and other appropriate relief through this civil action.

## PRAYER FOR RELIEF

WHEREFORE, having fully pled his case, Plaintiff Gary McNeal demands that this honorable Court award his reinstatement and back pay, or, in the alternative, award him emotional distress damages, front pay, back pay, compensation for lost benefits including, without limitation, COBRA and DROP contributions, liquidated damages, punitive damages, his reasonable attorney fees in this action, his costs in this action, and any and all such relief as this Court, or a jury may direct.

Respectfully submitted,

*/s/ Zachary Gottesman*
Zachary Gottesman (0058675)
Trial Attorney for the Plaintiff
Gottesman & Associates, LLC
404 East 12th St.
Cincinnati, OH 45202
Phone: (513) 651-2121
Fax: (513) 651-2131
zg@zgottesmanlaw.com

### JURY DEMAND

Plaintiff Gary McNeal hereby demands a jury of eight to hear all issues triable to a jury.

*/s/ Zachary Gottesman*
Zachary Gottesman (0058675)

EXHIBIT

A

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(i) |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 473-2018-01751 |

and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Gary T. Mcneal** | ~~redacted~~ | 1956 |

| Street Address | City, State and ZIP Code |
|---|---|
| ~~redacted~~ Hamilton, OH 45011 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **BLUE ASH POLICE DEPARTMENT** | 15 - 100 | (513) 745-8555 |

| Street Address | City, State and ZIP Code |
|---|---|
| **4343 Cooper Rd., Blue Ash, OH 45242** | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☒ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **08-03-2018**  Latest: **08-03-2018**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. I am a 61 year old, African American with darker skin. I have been employed with Respondent for 17 years. I have been treated less favorably than employees not of my protected class throughout my career. On many occasions, I was denied terms and conditions regarding promotions and training that coworkers not of my protected class received. Chief Scott Nole (Caucasian) (Substantially younger) subjected me to discipline and routinely scrutinized my performance. There have been multiple incidents were younger Caucasian coworkers were not held accountable or to the same standard. On August 3, 2018, I was placed on Administrative leave for allegedly violating a discretionary department policy. I am aware of younger Caucasian coworkers that used their discretion regarding the same policy and did not receive disciplinary actions. In 2018, I complained to Human Resources that Lt. Gearhardt, (Caucasian) (Substantially younger) and Chief Noel, were creating a hostile work environment. HR has failed to address my complaint.

II. I believe Management is responsible for the above discriminatory actions.

III. I believe I have been discriminated against because of my race, color, and retaliated against, in violation of title VII of the Civil Rights Act of 1964, as amended, and in violation of the Age Discrimination in Employment Act of 1967, as amended.

IV. This charge has not been dual filed with the Ohio Civil Rights Commission.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 09-19-18 _Gary T. McNeal_ Date / Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC, CINCINNATI AREA OFFICE

SEP 20 2018

RECEIVED

EEOC Form 161 (11/16)    **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**EXHIBIT**

**B**

## DISMISSAL AND NOTICE OF RIGHTS

| To: | **Gary T. Mcneal** ~~[redacted]~~ ~~Hamilton, OH 45011~~ | From: | **Cincinnati Area Office** John W. Peck Fed. Bldg 550 Main St Room 10-019 Cincinnati, OH 45202 |
|---|---|---|---|

| [ ] | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | | Telephone No. |
|---|---|---|---|
| 473-2018-01751 | **Daniel F. Williams,** Investigator | | **(513) 914-6015** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

*Melanie L. Breen*    SEP 1 9 2019

Enclosures(s)

**Melanie L. Breen,** **Area Office Director**

*(Date Mailed)*

cc:

**Lori Chaney** **Human Resources Director** **CITY OF BLUE ASH** **4343 Cooper Road** **Blue Ash, OH 45242**

**Stephen Ramsey** **Gottesman & Associates, LLC** **36 East Seventh Street, Suite 1650** **Cincinnati, OH 45202**

EXHIBIT

*C*

ZACHARY GOTTESMAN*
♦ALSO ADMITTED IN KY

## GOTTESMAN & ASSOCIATES, LLC
### ATTORNEYS AT LAW
36 EAST SEVENTH STREET, SUITE 1650
CINCINNATI, OHIO 45202-4452
EMAIL: zg@zgottesmanlaw.com
TELEPHONE: 513-651-2121
FACSIMILE: 513-651-2131

STEPHEN R. RAMSEY

14 February 2019

*Via Email (daniel.williams@eeoc.gov)*

Daniel Williams
U.S. EEOC
John W. Peck Federal Building
550 Main Street, Room 10-019
Cincinnati, OH 45202-5208

> *Re:*    *Gary McNeal vs. City of Blue Ash*
>       *Charge No. 473-2018-0175*

Dear Mr. Williams:

This letter is the reply of Patrol Officer Gary McNeal to the Position Statement submitted by the City of Blue Ash on 19 November 2018 in response to Officer McNeal's charge of discrimination.

Officer McNeal asserts that the City of Blue Ash has engaged in a pattern and practice of illegal discriminatory actions that targeted Officer McNeal and others similarly situated with the aim of forcing certain individuals to retire earlier than planned or to build cases against the targeted individuals to justify their termination. The City builds these cases against the targeted individuals, including Officer McNeal, by arbitrarily and inconsistently enforcing rules and regulations for minor infractions or for activities/actions by City employees that have not previously been the subject of disciplinary action.

In the case of Officer McNeal, the City, through the command staff of the Blue Ash Police Department, began targeting Officer McNeal in 2016 with the aim of forcing his retirement or termination because of his age and race. The details of the City's illegal discriminatory practices are outlined in this reply and are offered to establish the history of action leading up to the unlawful termination of Officer McNeal.

I.      Factual Background

Patrol Officer Gary McNeal is a 62-year-old African-American. He was hired by the Blue Ash Police Department as a patrol officer on 16 July 2001. Officer McNeal had no significant disciplinary issues until November 2011, when he received a documented oral reprimand for carelessness with police equipment. Officer McNeal had inadvertently left his police band radio on the roof of his patrol car and was later unable to locate it. (See Exhibit 1 attached hereto.)

Daniel Williams
14 February 2019
*Gary McNeal vs. City of Blue Ash*
*Charge No. 473-2018-0175*
Page 2

Between November 2011 and April 2016, Officer McNeal had no documented disciplinary action. On 21 April 2016, Officer McNeal received documented counseling for failing to ensure that his body camera microphone was operational during a traffic stop. (Exhibit 2 attached hereto.) An email dated 21 April 2016 at 12:56 PM from then-Sergeant Scott Noel to several BAPD officers, including Officer McNeal, reminds the recipients that they are required to carry and use a mic on traffic stops. (Exhibit 3 attached hereto.) This email was sent after Officer McNeal received documented counseling on the issue, and was followed the same day by an email from Lt. Joe Boyatt to all sergeants and patrol officers at 3:30 PM expressing concern that officers on all three shifts were not always wearing their wireless microphones as required. (Exhibit 4 attached hereto.) However, to Officer McNeal's knowledge, no other officers received documented counseling for the offense. It is worthy of mention that on 28 February 2016, Officer McNeal disputed certain portions of the performance evaluation he had received for the previous year. Although Officer McNeal's overall performance rating was "Fully meets performance requirements," his previous performance ratings had consistently been identified as "Exceeds performance requirements." Officer McNeal disputed the Sergeant's Score he had received in the categories identified as Quality of Work, Time Management, Continuous Improvement and Development, and Accountability.[1] (Exhibit 5 attached hereto.) Just one year prior, Officer McNeal had received Sergeant's Scores of 9, 8, 6, and 9 out of 10 in these categories respectively. (Exhibit 6 attached hereto.) It is Officer McNeal's position that the lower evaluation scores marked the beginning of an organized and concerted effort to force him out of the BAPD earlier than he intended. His documented disagreement with the lower scores angered command staff and led to retaliatory actions. At the outset of the campaign to oust Officer McNeal, Scott Noel held the rank of patrol sergeant, but was eventually promoted through the ranks to become Chief of Police in December 2017. As outlined in more detail below, Chief Noel has a history of inaccurate reporting and his credibility has been challenged on various occasions throughout his career.

Between March 2016 and August 2018, command staff implemented a campaign targeting Officer McNeal for termination or forced early retirement because of his age and race. Actions taken by the City against Officer McNeal intended to achieve this aim included discipline for minor infractions for which other officers received no discipline, and for decisions by Officer McNeal that had been previously deemed discretionary by command staff. The primary case in point is the decision by Officer McNeal to not respond with lights and siren to the emergency life squad run of 26 June 2018 which ultimately led to his unlawful termination by the City of Blue Ash. The City also claims that Officer McNeal was untruthful during the investigation of the incident, but as outlined below this is simply a pretext for justification of Officer McNeal's unlawful termination by impugning his ability to serve as a witness in future criminal prosecutions.

II.     The Incident and The Investigation

On 26 June 2018, Officer McNeal was dispatched to 9070 Plainfield Road in Blue Ash for a non-responsive male subject in the Frisch's Restaurant bathroom. The initial dispatch indicated

---

[1] Officer McNeal received scores of 6, 6, 5, and 6 out of 10 in these categories respectively.

Daniel Williams
14 February 2019
*Gary McNeal vs. City of Blue Ash*
*Charge No. 473-2018-0175*
Page 3

a possible overdose but was quickly revised to a non-breather in the men's bathroom stall.[2] Upon exiting the BAPD station, Officer McNeal observed the emergency life squad near the intersection of Reed Hartman Highway and Cooper Road, which is approximately 1.1 miles and two minutes from the Frisch's Restaurant when traveling at ordinary speed. The squad was in full code three response mode (lights and sirens) speeding on its way to 9070 Plainfield Road.[3] Because a life squad was already en route in code three mode, Officer McNeal determined it was not necessary for him to also respond code three. As evidenced by the statements of the officers interviewed during the investigation of this incident, whether to respond code three is within the discretion of the dispatched officer and is based on many factors unique to each situation.[4] There is no specific policy regarding code three responses involving life squads. There is no record that any other BAPD officer has been investigated and/or disciplined for failing to respond code three to a life squad run prior to Officer McNeal and Sgt. Charron.

Between 16 July and 1 August 2018, several officers were interviewed by Lt. Roger Pohlman and Lt. Robert Gerhardt as part of the investigation of Officer McNeal and Sgt. Ed Charron in connection with their response to the dispatch to the Frisch's Restaurant on Plainfield Road in Blue Ash on 26 June 2018 at 11:30 AM.

On 16 July 2018, Officer Robert Rockel was interviewed as part of the investigation into Officer McNeal's response to the Frisch's dispatch. In answer to questions about responding code three to the Frisch's call, Officer Rockel stated, "I don't think you should be going code three to something like that if the squad's already there."[5] In answering ever-increasing hypothetical questions about responding to the Frisch's call of 26 June 2018, Officer Rockel stated that it is clearly a judgment call whether an officer should respond code three and that many factors should be taken into consideration, including and especially if the life squad has or will arrive on the scene before the dispatched officer.[6]

Officer Dane Baumgartner was also interviewed on 16 July 2018 as part of the investigation. Lt. Pohlman identifies the dispatch to Frisch's as "a squad run."[7] Lt. Pohlman goes on to say, "Obviously that policy can't outline every single type of call," referring to department policy regarding code three responses.[8] When questioned how department policy applies to the Frisch's dispatch (or one like it), Officer Baumgartner states that although a speedy response is required, officers should not be putting themselves or others in danger.[9] Officer Baumgartner

---

[2] Ultimately it was determined that the subject had suffered a heart attack and died.
[3] Radio traffic and the fact that the squad was headed toward the Frisch's on Plainfield made it obvious to Officer McNeal that the squad was responding to the call. Exterior video from the BAPD also confirms this.
[4] See transcript excerpts attached hereto as Exhibits 7A-7E. Complete transcripts were previously provided to the Commission by the City of Blue Ash.
[5] Taped Interview of Robert Rockel, p. 11, lines 19-21.
[6] Taped Interview of Robert Rockel, p. 13, lines 6-16.
[7] Taped Interview of Dane Baumgartner, p. 6, lines 3-4.
[8] Taped Interview of Dane Baumgartner, p. 15, lines 1-2.
[9] Id. at lines 13-18.

Daniel Williams
14 February 2019
*Gary McNeal vs. City of Blue Ash*
*Charge No. 473-2018-0175*
Page 4

makes clear that responding officers should be speedy to the best their ability under the circumstances.[10]

Officer Jim Kelley stated in an interview recorded on 17 July 2018 that neither he nor anyone on his shift[11] had received any specific instructions on how to respond to calls beyond being told that they were to respond to all calls.[12] Officer Kelley went on to state that he typically does not run code three to a call for an unresponsive male if "one, I know a squad's going to beat me there anyway, and traffic is heavy in Blue Ash during the day shift and why put myself in that position."[13] Officer Kelley was referring to a call for a "male 50 unresponsive" to which he had responded without lights and siren approximately one week before the interview and approximately two weeks after Officer McNeal had responded to the call at Plainfield Road. Notably, Officer Kelley was not questioned, investigated, or disciplined for electing to respond to a squad run without lights and siren.

On 1 August 2018, Sgt. Ed Charron was interviewed as part of the investigation into the Frisch's run. While attempting to answer questions about various hypothetical scenarios presented by Lt's Pohlman and Gerhardt involving particular types of dispatches, Sgt. Charron, apparently exasperated, stated ". . . we've never gone code three to a squad run."[14]

Despite the established and predominant policy of permitting responding officers to determine on a case-by-case basis whether code three is warranted, especially in connection with life squad runs, Officer McNeal was singled out for investigation and discipline as the culmination of a two-year campaign to oust him from BAPD. At the time, Officer McNeal was the oldest officer on patrol. This action by command staff fits a history of targeting older officers for excessive, unfounded, and arbitrary discipline designed to force them out of the ranks of the department.[15]

Command staff alleged that Officer McNeal was untruthful during his interview on 20 July 2018. Specifically, the report generated by Lt's Pohlman and Gerhardt states that Officer McNeal falsely stated that he checked his MVR "most of the time," that he falsely stated he tries to regularly use his microphone and camera as required, and that he falsely stated that he heard (via radio) others arrive at the Frisch's scene before him.

Officer McNeal will testify that he routinely checked his MVR equipment as he believed he had been instructed and that he believed his checks to be correct. Officer McNeal will testify that he believed he was always syncing and using the MVR microphone as he believed he had been instructed, and that he believed his syncs and usage to be correct and in compliance with

---

[10] Id.

[11] At the time, Officer Kelley was on day shift, as was Officer McNeal.

[12] Taped Interview of Jim Kelley, pp. 8-9, lines 18 *et seq.*

[13] Taped Interview of Jim Kelley, pp. 11-12, lines 22 *et seq.*

[14] Taped Interview of Ed Charron, p. 26, line 5-7.

[15] The former BAPD officers identified herein will testify upon personal knowledge that BAPD command staff has consistently targeted older officers for excessive and arbitrary discipline to force them out of the department.

Daniel Williams
14 February 2019
*Gary McNeal vs. City of Blue Ash*
*Charge No. 473-2018-0175*
Page 5

department procedure. Perhaps more importantly, Officer McNeal stated during his interview that when he arrived on scene at Frisch's the Chief was already there along with squad and fire personnel, and that he believed Officer Dane Baumgartner was also there, "if I recall correctly."[16] Officer McNeal did not state with certainty that he heard others arrive on scene, but will testify that he heard who he believed to be Officer Dane Baumgartner call "3-5" (meaning arrived on scene) and then Officer McNeal called "3-5". When asked if he heard anyone on the radio say they were on scene, Officer McNeal answered, "I think so. Yeah, I think so."[17] This is not a statement of absolute certitude, but the expression of a belief based on memories of events that had occurred weeks earlier. This does not provide a basis to say that Officer McNeal was intentionally deceptive or made false statements. Officer McNeal was merely uncertain of what he had heard and when. Command staff has used this uncertainty to unfairly impugn the integrity of Officer McNeal and as a pretext for their position that Officer McNeal cannot perform one of his essential job duties, i.e. testify as a witness in future criminal prosecutions. The extrapolation of Officer McNeal's expressions of uncertainty when recalling aspects of a particular run that occurred weeks prior to his interview into an assertion that he cannot be relied upon to testify truthfully in criminal prosecutions is outrageous and unfounded. Any inconsistencies between Officer McNeal's recollections and the records prepared by command staff has no bearing on his ability to be truthful and forthright as a witness for the prosecution in any future case. This is clearly an effort to punish Officer McNeal and secure his termination. Any concern expressed by command staff that this provides a meaningful basis for defense attorneys to impeach Officer McNeal's credibility is an obvious pretext to support their ultimate goal of termination.

In the Interdepartmental Memorandum dated 2 October 2018 to Blue Ash City Manager David Waltz recommending the termination of Officer McNeal, Chief Noel notes that he particularly examined the discipline issued to Officer McNeal within the previous two years.[18] Consistent with the campaign to oust him, the only significant discipline issued to Officer McNeal during his career at BAPD occurred in the two years prior to his termination. During Officer McNeal's 33-year career in law enforcement, he never received any discipline resulting in suspension until the two-year period at BAPD immediately before his termination. Interestingly, no one from command staff or city administration inquired of Officer McNeal's well-being or investigated to determine if there was some underlying issue that was causing Officer McNeal to suddenly begin accruing a substantial disciplinary record in such a short period of time. Arguably, this is because as the target of a campaign to oust him, no one was interested in Officer McNeal's well-being nor in what may be affecting his abilities to perform his duties as a patrol officer because they knew there were no underlying issues. They simply wanted him out and took whatever steps were available to achieve that end.

It is significantly notable that despite the orchestrated machinations designed to secure his early departure, Officer McNeal continued to perform at the highest levels and received five

---

[16] Taped Interview of Gary McNeal, p. 8, lines 1-6.
[17] Id. at lines 11-14.
[18] Exhibit 8 attached hereto at page 3.

Daniel Williams
14 February 2019
*Gary McNeal vs. City of Blue Ash*
*Charge No. 473-2018-0175*
Page 6

written commendations throughout 2017 for his diligent work, professionalism, quick thinking, high level of customer service, and ability to practicably apply his training in real-life situations.[19]

Sgt. Ed Charron was also suspended, investigated, and faced imminent discipline in connection with the dispatch to Frisch's on 26 June 2018. Under the well-established policy of permitting officers to determine on a case-by-case basis whether to respond code three, Sgt. Charron elected to not activate his lights or siren when responding to the Frisch's call. As a result of that decision, and standing accused of untruthfulness during the course of the investigation, Sgt. Charron chose to retire early rather than face possible termination. Although identified as Caucasian in several investigative and departmental documents, Sgt. Charron self-identifies as Native-American and may have been subjected to similar treatment as Officer McNeal based on his race. Additionally, as described below, Sgt. Charron was involved in an incident that resulted in the shooting death of a motorist in 2007. It has been alleged that Chief Noel[20] initiated a high-speed pursuit without justification and falsely reported over radio dispatch that the suspect had tried to ram Noel's police cruiser. This false statement elicited the response of several officers including Sgt. Charron, who ultimately fatally shot the motorist/suspect. Sgt. Charron is among a very few officers who may know the truth of these allegations.

III.     Black v. City of Blue Ash and Scott Noel

In 2008, Scott Noel was named as a defendant in a federal lawsuit alleging that he made false statements in connection with a high-speed pursuit that ended in the death of a motorist.[21] Specifically, the plaintiff alleged that Noel falsely reported over radio dispatch to all available officers that a motorist, later identified as Charles Wayne Bennett, had tried to ram Noel's police cruiser with his vehicle. The plaintiff alleges that Noel made the false report to justify his high-speed pursuit of Mr. Bennett over a minor traffic infraction because the pursuit, which at times exceeded 100 mph, was in violation BAPD policy. To bolster his justification for the pursuit, Noel later reported that Mr. Bennett "tried to ram me three times."[22] The plaintiff asserts that this statement is false and is not supported by any of the video available from the police cruisers involved in the pursuit.

According to the plaintiff's complaint and police records, BAPD officers, including Sgt. Charron, joined the pursuit in reliance on Noel's statements that Bennett tried to ram Noel's police cruiser. As the pursuit progressed, it became clear that Mr. Bennett did not intend to stop for the police, and eventually Sgt. Charron shot and killed Mr. Bennett through the windshield of Mr. Bennett's vehicle.[23] The plaintiff alleges that had Noel not falsely reported that Mr. Bennett attempted to ram his cruiser and had instead followed BAPD policy regarding high-speed pursuits,

---

[19] See Exhibits 9A-9E attached hereto.

[20] Then Patrol Officer Noel.

[21] See Exhibit 10 attached hereto.

[22] Ex. 10 at ¶ 21.

[23] For the benefit of brevity, this is an oversimplification of events. A more detailed account is available through court and police records. The important issue here is Chief Noel's mendacity.

Daniel Williams
14 February 2019
*Gary McNeal vs. City of Blue Ash*
*Charge No. 473-2018-0175*
Page 7

Sgt. Charron would not have been placed in the circumstances that led him to fatally shoot Mr. Bennett. This raises questions about the disciplinary action taken against Sgt. Charron in 2018 that led to his early retirement.

Notably, no investigation was initiated and no disciplinary action was taken in connection with Noel's violation of BAPD policy regarding high-speed pursuits. The policy in place at the time required officers to "terminate their involvement in motor vehicle pursuits whenever the risks to their safety and others outweigh the consequences of the suspect's escape."[24] The policy states that its goal is to "restrict vehicle pursuits to those situations and circumstances in which immediate apprehension outweighs the hazard generated to the officer, public, or occupants of the vehicle."[25] Further, "the primary goal of law enforcement is the protection of life and property. If a motor vehicle pursuit exposes any officer, member of the public, or suspect to unnecessary risk, pursuit is inconsistent with that goal and should be terminated."[26]

Chief Noel[27] attempted to initiate a traffic stop when Mr. Bennett made an illegal u-turn. Chief Noel then engaged in a high-speed pursuit over a minor traffic infraction, placing himself and others at great risk in obvious conflict with the stated goals of BAPD policy. At the very least, the average observer would expect a cursory investigation of Chief Noel's decision-making processes and written recommendations on how he might improve. However, there is no record that any such action was taken.

The foregoing is offered to establish the history of practices within the BAPD that unfairly and unlawfully favor some officers over others by selective enforcement of policies and regulations. These unlawful practices were brought to bear on Officer McNeal as the Chief and his ilk sought to force him from the department by arbitrary and capricious disciplinary action. The following individuals will testify upon personal knowledge of the past and continuing discriminatory practices within the BAPD, including the practice of targeting individual officers for harassing selective enforcement of policies and regulations because of their age, and may identify additional witnesses:

John Connolly
BAPD, June 2001- April 2018 (retired)
(513) ███-████

Chris Zielinski
BAPD, June 2001-April 2017 (retired)
(513) 276-0822

---

[24] BAPD Policy 12.045.
[25] Id.
[26] Id.
[27] Then Patrol Officer Noel.

Daniel Williams
14 February 2019
*Gary McNeal vs. City of Blue Ash*
*Charge No. 473-2018-0175*
Page 8

> Erskine Page
> BAPD, June 1987-June 2013 (retired)
> ▰▰▰▰▰▰▰▰▰
>
> Mark Ziegler (retired)
> BAPD
> ▰▰▰▰▰▰▰▰▰

These individuals will also testify upon personal knowledge to the well-established policy and practice of permitting BAPD officers to determine on a case-by-case basis whether a code three response to a particular call is authorized and warranted based on the circumstances, and will testify that prior to Officer McNeal and Sgt. Charron, no other officer had been investigated or disciplined for electing to respond without lights and siren to a life squad run.

IV.   Law and Argument

To prove a prima facia case of race or age discrimination, a charging party must show that 1) he is a member of a protected class, 2) he was qualified for his job and performed it satisfactorily, 3) despite his qualifications and performance, he suffered adverse employment action, and 4) he was treated less favorably than a similarly situated individual outside his protected class.

As stated above, Officer McNeal is a member of protected classes because he is African-American and over the age of forty. Based on his extensive record with BAPD since 2001, Officer McNeal is eminently qualified for the position of patrol officer and performed commendably in that position. Despite his qualifications and performance, Officer McNeal suffered adverse employment actions, up to and including termination, because of his age and race when similarly situated individuals were treated more favorably despite engaging in the same or similar conduct. Most notably in this case, Officer Jim Kelley, who is white, stated in his recorded interview on 17 July 2018 that on or about 12 July 2018 he responded to a dispatch for "male 50 unresponsive" without lights and siren because he typically does not run code three to a call for an unresponsive male if "one, I know a squad's going to beat me there anyway, and traffic is heavy in Blue Ash during the day shift and why put myself in that position."[28] Gary McNeal was responding to a call on day shift for an unresponsive male, and he had direct personal knowledge that the life squad was going to arrive on scene before him because he saw the squad speed past the station in full code three response mode. Based on the well-known policy of permitting officers to exercise individual discretion regarding code three responses in connection with life squad runs, Officer McNeal elected not to activate his lights and siren just as Officer Jim Kelley had. However, Officer McNeal was suspended pending an investigation that ultimately led to his termination while Officer Kelley was not even questioned about his decision not to respond code three to a similar run involving a life squad.

---

[28] Taped Interview of Jim Kelley, pp. 11-12, lines 22 *et seq.*

Daniel Williams
14 February 2019
*Gary McNeal vs. City of Blue Ash*
*Charge No. 473-2018-0175*
Page 9

These facts alone establish a prima facia case of discrimination, foreclose the dismissal of Officer McNeal's charge of discrimination, and warrant further investigation. Officer McNeal's charge of retaliation is based on his multiple expressions of dissatisfaction to command staff with the treatment he received from command staff because of his age and race. Further investigation will reveal retaliatory action up to and including termination that was the direct result of Officer McNeal's opposition to the unlawful treatment he and others received because of age and race.

Officer Gary McNeal hereby retains all rights to further modify and supplement this reply as additional information may become available or is requested by the Commission.

Kind regards,

Zachary Gottesman

Encl.

cc:     Gary McNeal
        Stephen R. Ramsey, Esq.

# SCIPLINARY ACTION FOR

**Exhibit 1**

|  |  |
|---|---|
| **INCIDENT DATE:** | 10/29/11 |
| **DEPARTMENT:** | Police |

**NAME:** Police Officer Gary McNeal  **EFFECTIVE DATE:** 11/03/11

**TYPE OF DISCIPLINARY ACTION:**

- X  **DOCUMENTED ORAL REPRIMAND**
- __  **WRITTEN REPRIMAND**
- __  **SUSPENSION WITHOUT PAY**  ( _____ **DAYS OR** _____ **HOURS**)
- __  **TEMPORARY REASSIGNMENT**  ( _____ **DAYS OR** _____ **HOURS**)
- __  **DEMOTION (CHANGE IN CLASSIFICATION)**
- __  **DISCHARGE**
- __  **OTHER (DESCRIBE):** _____

**DESCRIPTION OF INCIDENT RESULTING IN DISCIPLINARY ACTION:**

On 10/29/11, Police Officer McNeal P.O. McNeal reported that he'd mistakenly left his city band police radio on the roof of his patrol car while stopped at CompuCom, 5481 Creek Rd. He later noticed it was missing and last remembered having it at that location. P.O. McNeal and other officers checked the area repeatedly but were unable to locate the radio. The radio's RIN is 103076. Reference report 2011000002150.

**IN VIOLATION OF:** Section 135.10 (f) Blue Ash Codified Ordinances: "Carelessness or negligence with the moneys or the property of the City, including the use of City equipment."

**EMPLOYEE'S RESPONSE:** _____

_____

_____

**SUPERVISOR'S REMARKS:** Employee is hereby counseled regarding the importance of securing police equipment and that further violations of this nature may result in more severe discipline up to and including termination.

**SIGNATURES:** _~~Gary J. McNeal~~_  _11-04-11_
EMPLOYEE  DATE

_~~Capt. Robert S. Lindley~~_  _11-4-11_
CAPT. ROBERT S. LINDLEY  DATE

_~~Chris D. Wallace~~_  _4 Nov 11_
CHIEF CHRIS D. WALLACE  DATE

**DISTRIBUTION:**
ORIGINAL TO PERSONNEL FILE
COPY TO EMPLOYEE

Additional information supporting the above categories may be attached herewith.

Exhibit 2

 **BLUE**ASH
ASPIRE, ACHIEVE, ADVANCE.

**BLUE ASH POLICE DEPARTMENT**

4343 Cooper Road
Blue Ash, Ohio 45242
513.745.8555

## Documented Counseling

*P.O Gary McNeal*                    *449*                    *4-21-2016*

*Employee*                    *Employee #*                    *Date of Counseling*

*Noteworthy:* ☐          *Corrective:* ☒

### Supervisor's Narrative of Incident and Counseling:

On 4/21/2016 at 0839 hrs , P.O. McNeal initiated a traffic stop on Reed Hartman Hwy south of Cooper Road. I responded and backed up Officer McNeal. I asked Officer McNeal to see his in-car camera body microphone that is required by Blue Ash Police Policy. Officer Mc Neal advised that he did not have a body microphone as required. Officer McNeal is reminded that per Blue Ash Police Policy, all officers are required to have a microphone while on duty and to use said equipment when applicable

### Attach additional narratives or supporting documentation:

Officer McNeal was also provided a copy of the department policy pertaining to in-car cameras and their usage.

*Employee's response or comments: (to be completed by the Supervisor)*

_____
*Supervisor*

_____          4/21/16
*Lt.* Review                    Date:

BAPD-STF02

**McNeal, Gary**

# Exhibit 3

| | |
|---|---|
| **From:** | Noel, Scott |
| **Sent:** | Thursday, April 21, 2016 12:56 PM |
| **To:** | Schrand, Ken; Roach, Beth; Kelley, Jim; Zielinski, Chris; Swartwout, Jason; McNeal, Gary; Keller, Steve |
| **Cc:** | Wimmers, Jim |
| **Subject:** | In car Cameras |

A reminder,

You are required to carry a mic with you and use it on traffic stops etc. This has caught the attention of the Chief as he has noted several recent violations. In addition, you need to check it during your vehicle inspection to make sure it is working properly, if not, write it up. Don't put yourself or Jim and me in a difficult spot.

Scott D. Noel
Sergeant
Blue Ash Police Department
4343 Cooper Rd
Blue Ash, OH 45242
513-745-6224
snoel@blueash.com



**McNeal, Gary**

# Exhibit 4

| | |
|---|---|
| **From:** | Boyatt, Joe |
| **Sent:** | Thursday, April 21, 2016 3:30 PM |
| **To:** | Police Sergeants; Police Patrol Officers; Police Auxiliary Unit |
| **Subject:** | A Couple of Safety Related Issues |

I have observed 2 things that I need everyone's help to correct:

1. Back-up/Cover Officer- in the recent past I have heard **officers on all three shifts** disregarding their cover cars on various details (Sig. 30's, Traffic Stop, etc) or in some cases officers not knowing where their fellow officers are after they have requested a cover car. We typically are not so busy that we can't send two officers to an alarm drop or cover another officer on a stop. If we are, that's probably the exception more than the rule. We don't compromise on officer safety during the FTO process so I can't think of any reason why it's less important once officers are out of training. *This is an officer safety issue and we need to improve in this area.*

2. Wireless Mic for the Arbitrator System- in reviewing a number of traffic stops it was discovered that **officers on all three shifts** are not always wearing their wireless microphone. In some cases the video shows the individual officers not wearing the mic as a matter of routine. This equipment is there to protect the individual officer, the Police Department and the City and it is *an officer safety concern*.

   a. If the mic is not working, you need to take it out of service & write it up

   b. If you leave it in the cruiser at the end of your shift it probably won't work for the next officer or the next day when you return to work. These mics WILL NOT charge when the car is not running. This afternoon three were found in cars that were not being used and were not charged.

Your assistance in addressing these issues is greatly appreciated.

Joe Boyatt
Police Lieutenant
Blue Ash Police Department
4343 Cooper Road
Cincinnati, Ohio 45242
(513) 745-6225



jboyatt@blueash.com  www.blueash.com/police  www.facebook.com/blueashpolice

Exhibit 5



**BLUE ASH POLICE DEPARTMENT**

**PERFORMANCE REVIEW AND DEVELOPMENT FORM**
**PATROL OFFICERS**

☑ Officer's Self-Assessment        Officer's name: Gary McNeal

☑ Sergeant's Assessment        Sergeant's name: Sgt. Wimmers / Sgt. Noel

Evaluation period: 01/01/2015   to   12/31/2015    Review date: 02/28/0201

Type of review: ☑ Annual      ☐ End of probation      ☐ Special

## I. REVIEW OF PAST YEAR'S GOALS AND RESULTS

List past year's performance goals and describe results achieved for each (quantitative and qualitative accomplishments including process/systems improvement, leadership, numerical accomplishments, etc.)

| Performance Goals | Summary of Results |
|---|---|
| Continued participation as firearms armorer | No additional training received |
| Inclusion in firearms training | Did not seek to obtain additional open firearms position |
| Continue in Magloclen trainings and information regarding motorcycle gang related issues | Did not attend any new seminar sessions. |
| Become more active with schools | Increased patrols of schools but not contacts at schools. |
| Attend leadership classes to help in mentoring junior officers. Read leadership materials on my own and work towards bettering myself as a leader in my current position. | No classes attended. Has reviewed materials offered on station. |
| | |
| | |

## II. REVIEW OF PAST YEAR'S PERFORMANCE

In each of the 17 categories, please choose one rating that most closely applies to the area listed. Then mark the number chosen in the area beside "Score". Once all of the areas of performance have been rated, mark the appropriate box in the "Overall Performance" section that best describes the officer's performance.

### 1. JOB KNOWLEDGE

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Does not possess knowledge and skills to perform job. | | **Marginal** Has minimal knowledge and skills to perform job. | | **Good** Has adequate knowledge and skills to perform job. | | **Very Good** Has above average knowledge and skills to perform job. | | **Exceptional** Has superior knowledge and skills to perform job. | |

**Officer's Self-Score** [ 8 ]  **Sergeant's Score** [ 6 ]

COMMENTS: (Please state why you chose this particular number.)

Displays knowledge and skills to perform job. Needs to be more efficient when doing criminal arrest paperwork. Mistakes on Felony arrest caused issues with HCMC

### 2. MEETING DEADLINES

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Consistently fails to meet deadlines. | | **Marginal** Frequently fails to meet deadlines. | | **Good** Usually meets deadlines. | | **Very Good** Frequently completes work ahead of schedule with high accuracy. | | **Exceptional** Consistently completes work ahead of schedule with high accuracy. | |

**Officer's Self-Score** [ 8 ]  **Sergeant's Score** [ 6 ]

COMMENTS: (Please state why you chose this particular number.)

Consistently completes work timely and accurately. Could be more efficient in the amount of time it takes to complete proper paperwork.

### 3. ATTENDANCE

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Consistently is absent or late. | | **Marginal** Usually on time. Takes excessive leave or is excessively tardy which warrants investigation. | | **Good** Present and on time. Normal amount of authorized leave or tardiness. | | **Very Good** Present and prompt. Infrequent authorized leave or tardiness. | | **Exceptional** Always present and on time, often early. Willing to work unusual hours without complaint. | |

**Officer's Self-Score** [ 9 ]  **Sergeant's Score** [ 9 ]

COMMENTS: (Please state why you chose this particular number.)

Always present and early. Prompt for training. Always willing to come in early and help the shift out. 76.5 hours of sick/personal, injury.

## 4. WORK PERFORMANCE

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Consistently fails to meet work standards. | | **Marginal** Frequently fails to meet work standards. | | **Good** Keeps pace and meets work standards. | | **Very Good** Frequently exceeds work standards. | | **Exceptional** Consistently exceeds work standards. Jumps in and helps in extra areas where needed. | |

**Officer's Self-Score** 8      **Sergeant's Score** 5

COMMENTS: (Please state why you chose this particular number.)

Keeps pace and meets work standards. Avg 4 Tstops a month, Avg 3 Cites a month, 0 Firs. could increase score if he was more proactive. 4 Noteworthy entries, 1 corrective documented counseling. Needs to give better investigative effort in getting details for follow-up.

## 5. QUALITY OF WORK

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Consistently inferior work quality and accuracy. | | **Marginal** Frequently inferior work quality and accuracy; lack of organizational skills. | | **Good** Quality of work and accuracy meets standards. | | **Very Good** Frequently exceeds standards in work quality and accuracy; well organized. | | **Exceptional** Consistently exceeds standards in work quality and accuracy; exemplary planning and organizational skills. | |

**Officer's Self-Score** 8      **Sergeant's Score** 6

COMMENTS: (Please state why you chose this particular number.)

Excellent OH-1s neat. Paper reports neat and accurate. could be more in-depth on information gathered. 2 complaints, not being prepared for court, 1- HCMC, 1-BAMC

## 6. TIME MANAGEMENT

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Seems to have no concept of time management. Has difficulty focusing on task at hand; must be supervised. | | **Marginal** Has some difficulty with time management; easily distracted from task at hand; must be supervised. | | **Good** Demonstrates sufficient time management. Stays focused on task at hand with little supervision. | | **Very Good** Demonstrates effective time management; able to multi-task and stay focused with no supervision. | | **Exceptional** Demonstrates highly effective time management skills; able to stay focused and multi-task with no supervision and able to keep others focused. | |

**Officer's Self-Score** 8      **Sergeant's Score** 6

COMMENTS: (Please state why you chose this particular number.)

Would benefit from being more time efficient. Good work product ,but sometimes takes too long to complete.

## 7. FOLLOWING PROCEDURES

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Shows no interest in following procedures and often argues over procedure or shows complete disregard for following procedure. | | **Marginal** Has some difficulty in following procedures and is sometimes unaware of what procedures to follow. | | **Good** Satisfactorily follows procedures. | | **Very Good** Is knowledgeable of procedures and follows them accurately. | | **Exceptional** Has exceptional understanding of procedures and uses them effectively. | |

**Officer's Self-Score** | 8 |  **Sergeant's Score** | 6 |

COMMENTS: (Please state why you chose this particular number.)

Would benefit from re-reading policies. Should know frequently used arrest procedures, without consulting sources.

## 8. WRITTEN AND VERBAL SKILLS

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Consistently fails to communicate and/or understand directions. | | **Marginal** Frequently fails to communicate; often fails to understand directions. | | **Good** Communicates satisfactorily; willingly gives and receives feedback. | | **Very Good** Communicates well; frequently initiates communication; clear in communication style. | | **Exceptional** Consistently communicates very well; clear and open feedback; constructive approach. | |

**Officer's Self-Score** | 9 |  **Sergeant's Score** | 7 |

COMMENTS: (Please state why you chose this particular number.)

Would increase his score if report narratives were more in depth. (Rather short)

## 9. CARE OF EQUIPMENT

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Irresponsible with equipment; neglects care and attention of city property. | | **Marginal** Frequently careless with equipment; overlooks proper care and attention. | | **Good** Takes suitable responsibility for the state of equipment. | | **Very Good** Pays attention to detail; equipment frequently in good order. | | **Exceptional** Takes full responsibility for care and maintenance of equip.; goes a step beyond to assure proper upkeep. | |

**Officer's Self-Score** | 9 |  **Sergeant's Score** | 8 |

COMMENTS: (Please state why you chose this particular number.)

Takes care and responsibility for his equipment. Pays attention to detail; equipment frequently in good order.

## 10. INITIATIVE

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Requires constant supervision, shows no interest or ambition in work. | | **Marginal** Requires much supervision, shows little interest or ambition. | | **Good** Requires some supervision, shows interest and initiative. | | **Very Good** Needs minimal supervision, is interested and ambitious. Goes the extra mile. | | **Exceptional** Needs no supervision, very interested and ambitious. Shows consistent initiative and innovation. | |

Officer's Self-Score  7

Sergeant's Score  4

COMMENTS: (Please state why you chose this particular number.)

Failed to meet front page goals. Proactive numbers are low. Summary of results on front page indicate little to no self-initiative. Don't be told to go do or be forced to go do. Low initiative to do more than is asked or required.

## 11. ORGANIZATIONAL ADAPTABILITY

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Argumentative & disruptive; usually a poor listener; often discourteous to public. | | **Marginal** Usually cooperates; periodic problems in dealing with co-workers or public. | | **Good** Gets along cooperatively and courteously with co-workers, supervisors and public. | | **Very Good** Consistently takes positive approach with co-workers, supervisor and public. Liked and good with people. | | **Exceptional** Excellent human relations skills. Very well liked. Positive and always helpful and pleasant. | |

Officer's Self-Score  7

Sergeant's Score  6

COMMENTS: (Please state why you chose this particular number.)

Frequently takes approach that the administration is not doing what's best for patrol officers. Well liked by co-workers and supervisors.

## 12. CUSTOMER SERVICE

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Rude or inattentive to the public. Does not follow through with public requests/needs. | | **Marginal** Some difficulties relating to the public. Doesn't always follow through with public requests/needs. | | **Good** Courteous and polite while communicating with the public. Follows through with public requests/needs. | | **Very Good** Very upbeat, friendly, and courteous to the public. Follows through with request/needs in a timely manner. | | **Exceptional** Displays impressive poise under stress while dealing with the public. Deals with public requests in a timely and creative manner. | |

Officer's Self-Score  9

Sergeant's Score  8

COMMENTS: (Please state why you chose this particular number.)

Communication with the community is top-notch. Controls demeanor well under all circumstances.

**13. CONTINUOUS IMPROVEMENT AND DEVELOPMENT**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** | | **Marginal** | | **Good** | | **Very Good** | | **Exceptional** | |
| Has fallen behind in skills/field and consistently fails to use available resources. | | Needs help to keep up with skills/field and usually fails to use available resources. | | Stays current with skills/field and uses some available resources. | | Stays current and broadens knowledge/ sharpens skills by frequently using available resources. | | Stays ahead of the game, advancing skills and knowledge by consistently using resources at work and on own. | |

Officer's Self-Score  6                      Sergeant's Score  5

COMMENTS:          (Please state why you chose this particular number.)

Put in for training. Go to training, then do something with it. Show that sending you to (voluntary) training is valuable to the city.

**14. ORGANIZATIONAL TEAM PLAYER**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** | | **Marginal** | | **Good** | | **Very Good** | | **Exceptional** | |
| Shows no interest in being a team player; does not participate with other division/department members; does not work well with others. | | Participates minimally in organizational activities/meetings (departmental, divisional, or city-wide); frequently has difficulty working with others. | | Participates regularly in organizational activities/meetings (departmental, divisional, or city-wide); works with others. | | Participates enthusiastically in organizational activities/meetings (departmental, divisional, or city-wide); works well with others. | | High interest and consistent participation in organizational activities/ meetings (departmental, divisional, or city-wide). Is exceedingly co-operative with others. Seen as influential to team. | |

Officer's Self-Score  7                      Sergeant's Score  6

COMMENTS:          (Please state why you chose this particular number.)

Works well with others, participates regularly in discussions about the shift and the department.

**15. PERSONAL APPEARANCE**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** | | **Marginal** | | **Good** | | **Very Good** | | **Exceptional** | |
| Very sloppy in appearance or unacceptably dressed; or unacceptable personal habits. | | Dress or grooming less than satisfactory; or some offensive personal habits. | | Properly dressed and groomed. Few poor personal habits. | | Very well dressed and groomed. No offensive personal habits. | | Excellent appearance, maintains outstanding personal habits. | |

Officer's Self-Score  7                      Sergeant's Score  7

COMMENTS:          (Please state why you chose this particular number.)

Well dressed and groomed. Does not participate in the department's P.T. testing.

## 16. ACCOUNTABILITY

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Does not take responsibility for own actions and/or work; lacks ability to accept ownership; blames others for any problems. | | **Marginal** Has difficulty taking responsibility for actions and/or work; often places blame on others. | | **Good** Takes responsibility for actions and/or work. | | **Very Good** Takes responsibility for actions and/or work; dependable; rarely displaces blame. | | **Exceptional** Consistently demonstrates high level of responsibility for actions and/or work; takes ownership of actions and/or work; serves as an example to others. | |

Officer's Self-Score  9                                     Sergeant's Score  6

COMMENTS:        (Please state why you chose this particular number.)

Look at narrative (13), that blames the bosses.

## 17. PROFESSIONALISM

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Frequently inappropriate in speech and behavior; offensive to others. | | **Marginal** Has difficulty distinguishing appropriate behavior. | | **Good** Is proper in speech and behavior; seldom displays inappropriateness with others. | | **Very Good** Demonstrates proper behavior with others; rarely impolite; well-spoken; professional in appearance. | | **Exceptional** Demonstrates high level of professionalism; well respected by public and employees; clearly promotes professional image desired by city employees. | |

Officer's Self-Score  9                                     Sergeant's Score  7

COMMENTS:        (Please state why you chose this particular number.)

Demonstrates proper behavior with others. Professional.

**III. OVERALL PERFORMANCE RATING** (Place an "X" in the box that best reflects the officer's level of performance).

☐ Does not meet performance requirements.

☑ Fully meets performance requirements.

☐ Exceeds performance requirements.

## IV. PERFORMANCE OBJECTIVES FOR THE NEXT APPRAISAL PERIOD

List goals and action steps, with anticipated results, for the upcoming appraisal period. Include functional, leadership, and training/development objectives where applicable. Use **SMART** goals (**S**pecific, **M**easurable, **A**ttainable, **R**esults-oriented, **T**ime-bound).

| Performance Objectives | Action Plan/Timing |
|---|---|
| ~~Go to a school to re-ignite or re-energize.~~ INCREASED DOCUMENTED ENFORCEMENT | DOCUMENTED ENFORCEMENT, Aug 1 DOCUMENTED ENFORCEMENT PER SHIFT. |
| ~~Learn something new, a new skill, a new area of police work.~~ | |
| | |
| | |

## V. OFFICER'S COMMENTS ON PERFORMANCE EVALUATION

Please mark one of the boxes below indicating whether you agree or disagree with this performance evaluation. You may add any comments to this appraisal. If you attach commentary due to your disagreement with this performance assessment, be sure to address your specific areas/points of disagreement. If there is not enough room below, you may include any comments as an attachment.

☐ Overall, I agree with this evaluation of my performance.

☑ Overall, I disagree with this evaluation of my performance. See my comments below.

_I DISAGREE WITH # 5, 6, 13, 16, MY COMMENTS WILL NOT CHANGE ANYThing. BUSINESS AS USUAL._

## VI. ACKNOWLEDGEMENTS

Officer: By signing this performance review, I acknowledge that the review has been discussed with me and I have been given a copy for my use.

**Officer:**
GARY T. McNEA
PRINTED NAME

SIGNATURE

03-22-16
DATE

**Sergeant:**
Scott Noel
PRINTED NAME

SIGNATURE

3-22-16
DATE

**Sergeant:**
Jim Wimmers
PRINTED NAME

SIGNATURE

3-23-16
DATE

**Operations Lieutenant:**
Joe Boyatt
PRINTED NAME

SIGNATURE

4/18/16
DATE

Patrol Officer Review and Development Form

Page 9



**BLUE ASH POLICE DEPARTMENT**

**PERFORMANCE REVIEW AND DEVELOPMENT FORM**
**PATROL OFFICERS**

# Exhibit 6

| ☑ Officer's Self-Assessment | Officer's name: | Gary McNeal | | |
|---|---|---|---|---|
| ☑ Sergeant's Assessment | Sergeant's name: | Sgt. Wimmers / Sgt. Noel | | |
| Evaluation period: 01/01/2014 to | 12/31/2014 | Review date: | 02/07/2015 | |
| Type of review: ☑ Annual | ☐ End of probation | | ☐ Special | |

## I. REVIEW OF PAST YEAR'S GOALS AND RESULTS

List past year's performance goals and describe results achieved for each (quantitative and qualitative accomplishments including process/systems improvement, leadership, numerical accomplishments, etc.)

| Performance Goals | Summary of Results |
|---|---|
| Armorer Training | Obtained Certification as an AR15/M16/M4 armorer |
| Gang awareness | Attended Magloclen's Technologies used by Police Training |
| Maintain high standards for traffic enforcement / issuing citations. | Continued to be a high performer in traffic citations and crash investigations |
| | |
| | |

## 4. WORK PERFORMANCE

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Consistently fails to meet work standards. | | **Marginal** Frequently fails to meet work standards. | | **Good** Keeps pace and meets work standards. | | **Very Good** Frequently exceeds work standards. | | **Exceptional** Consistently exceeds work standards. Jumps in and helps in extra areas where needed. | |

Officer's Self-Score [ 6 ]  Sergeant's Score [ (8 ]

COMMENTS: (Please state why you chose this particular number.)

As described in score guidelines.

** Sgts response..Always willing to help everyone. Complete paperwork completely, correctly, and legibly. Makes sound decisions on runs. Rarely needs direction from supervision.

## 5. QUALITY OF WORK

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Consistently inferior work quality and accuracy. | | **Marginal** Frequently inferior work quality and accuracy; lack of organizational skills. | | **Good** Quality of work and accuracy meets standards. | | **Very Good** Frequently exceeds standards in work quality and accuracy; well organized. | | **Exceptional** Consistently exceeds standards in work quality and accuracy; exemplary planning and organizational skills. | |

Officer's Self-Score [ 8 ]  Sergeant's Score [ (9 ]

COMMENTS: (Please state why you chose this particular number.)

As described in score guidelines.** Sgts response... Sgt Noel would like Officer McNeal to step out of his comfort zone and learn something new, i.e. a skill, investigation? Sgt Wimmers has been assigning him to Gang Related workshops. Officer McNeal has stayed active in his role as an armorer.Work completed accurately and neatly. Reports are rarely returned for any corrections. Excellent OH-1s.

## 6. TIME MANAGEMENT

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Seems to have no concept of time management. Has difficulty focusing on task at hand; must be supervised. | | **Marginal** Has some difficulty with time management; easily distracted from task at hand; must be supervised. | | **Good** Demonstrates sufficient time management. Stays focused on task at hand with little supervision. | | **Very Good** Demonstrates effective time management; able to multi-task and stay focused with no supervision. | | **Exceptional** Demonstrates highly effective time management skills; able to stay focused and multi-task with no supervision and able to keep others focused. | |

Officer's Self-Score [ 8 ]  Sergeant's Score [ 8 ]

COMMENTS: (Please state why you chose this particular number.)

As described in score guideline.

** Sgts response..Completes tasks on time without supervision. He always keeps supervisors aware and updated regarding his assignments and duties.

## 13. CONTINUOUS IMPROVEMENT AND DEVELOPMENT

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Has fallen behind in skills/field and consistently fails to use available resources. | | **Marginal** Needs help to keep up with skills/field and usually fails to use available resources. | | **Good** Stays current with skills/field and uses some available resources. | | **Very Good** Stays current and broadens knowledge/ sharpens skills by frequently using available resources. | | **Exceptional** Stays ahead of the game, advancing skills and knowledge by consistently using resources at work and on own. | |

Officer's Self-Score 6
Sergeant's Score 6

COMMENTS: (Please state why you chose this particular number.)

As described in score guidelines. ** Sgts response.. Sgt Noel; would like to see Officer McNeal step out of his comfort zone and learn something new. Sgt. Wimmers; would like Officer McNeal to take a more active role in mentoring current and new officers and would also like to see Officer McNeal take more active role in firearms training/help train.

## 14. ORGANIZATIONAL TEAM PLAYER

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Shows no interest in being a team player; does not participate with other division/department members; does not work well with others. | | **Marginal** Participates minimally in organizational activities/meetings (departmental, divisional, or city-wide); frequently has difficulty working with others. | | **Good** Participates regularly in organizational activities/meetings (departmental, divisional, or city-wide); works with others. | | **Very Good** Participates enthusiastically in organizational activities/meetings (departmental, divisional, or city-wide); works well with others. | | **Exceptional** High interest and consistent participation in organizational activities/ meetings (departmental, divisional, or city-wide). Is exceedingly co-operative with others. Seen as influential to team. | |

Officer's Self-Score 7
Sergeant's Score 7

COMMENTS: (Please state why you chose this particular number.)

As described in score guidelines when included to participate.

***Sgts response.. Officer McNeal plays a key role as a bargaining unit representative and is always ready and willing to meet with the Police Administration to resolve any issues.

## 15. PERSONAL APPEARANCE

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Very sloppy in appearance or unacceptably dressed; or unacceptable personal habits. | | **Marginal** Dress or grooming less than satisfactory; or some offensive personal habits. | | **Good** Properly dressed and groomed. Few poor personal habits. | | **Very Good** Very well dressed and groomed. No offensive personal habits. | | **Exceptional** Excellent appearance, maintains outstanding personal habits. | |

Officer's Self-Score 7
Sergeant's Score 8

COMMENTS: (Please state why you chose this particular number.)

As described in score guidelines. Can improve on physical conditioning.

**Sgts response..Keeps duty gear clean and in working order. Always squared away.

## 16. ACCOUNTABILITY

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Does not take responsibility for own actions and/or work; lacks ability to accept ownership; blames others for any problems. | | **Marginal** Has difficulty taking responsibility for actions and/or work; often places blame on others. | | **Good** Takes responsibility for actions and/or work. | | **Very Good** Takes responsibility for actions and/or work; dependable; rarely displaces blame. | | **Exceptional** Consistently demonstrates high level of responsibility for actions and/or work; takes ownership of actions and/or work; serves as an example to others. | |

Officer's Self-Score [ 9 ]                    Sergeant's Score [ 9 ]

COMMENTS: (Please state why you chose this particular number.)

As described in score guidelines.
** Sgts response... Takes responsibility for actions, good or bad.   Takes others opinions seriously and use those opinions to plan for future endeavors. Operates in an efficient, methodical manner. Extremely dependable to get the job done.

## 17. PROFESSIONALISM

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| **Poor** Frequently inappropriate in speech and behavior; offensive to others. | | **Marginal** Has difficulty distinguishing appropriate behavior. | | **Good** Is proper in speech and behavior; seldom displays inappropriateness with others. | | **Very Good** Demonstrates proper behavior with others; rarely impolite; well-spoken; professional in appearance. | | **Exceptional** Demonstrates high level of professionalism; well respected by public and employees; clearly promotes professional image desired by city employees. | |

Officer's Self-Score [ 9 ]                    Sergeant's Score [ 9 ]

COMMENTS: (Please state why you chose this particular number.)

As described in score guidelines.
** Sgts response..Displays professionalism in the job.  Maintains a positive attitude.  Respected by others in the police department as well as by employees from other city departments. Promotes a positive and professional image to the public.

## III. OVERALL PERFORMANCE RATING (Place an "X" in the box that best reflects the officer's level of performance).

☐ Does not meet performance requirements.

☐ Fully meets performance requirements.

☑ Exceeds performance requirements.

Exhibit 7A
Robert Rockel

1

- - - - -

TAPED INTERVIEW OF ROBERT ROCKEL

Monday, July 16, 2018

8:58 a.m. until 9:32 a.m.

Blue Ash Police Department

4343 Cooper Road

Cincinnati, Ohio 45242

- - - - -

PRESENT DURING INTERVIEW:

Lt. Roger Pohlman

Lt. Robert Gerhardt

- - - - -

ARMSTRONG AND OKEY, INC.
222 East Town Street, Second Floor
Columbus, Ohio 43215
(61) 224-9481 - (800) 223-9481

11

1          MR. POHLMAN:  Okay.

2          MR. ROCKEL:  Well, okay, with that being

3      said, too, if the squad already gets there and

4      they're administering Narcan and you get that

5      information, then you probably shouldn't go

6      code three.

7          MR. POHLMAN:  Okay.

8          MR. ROCKEL:  So, I mean, I guess --

9          MR. POHLMAN:  So, in this case if you --

10     so, if you had additional information, it might

11     change your response is what you're saying.

12         MR. ROCKEL:  Sure.  And depending on where

13     you're at in the city.  I mean, if -- if you're

14     up on Cornell and a call comes up on Frisch's

15     and the squad's already beaten you there and

16     they're taking care of life saving measures, it

17     doesn't make sense for you to go code three

18     while they're doing what you could have been

19     doing already.  I don't think you should be

20     going code three to something like that if the

21     squad's already there.

22         MR. POHLMAN:  Do you think it changes

23     anything that it was not only unresponsive but

24     dispatched as a possible person with a Heroin

Robert Rockel

13

1    acting violent.  Now, the squad usually has at

2    least three guys there.  Now, granted they're

3    not trained but there's three guys there, and

4    then does that outweigh a code three at 11

5    o'clock from wherever you're coming from.

6         I mean, I -- we're kind of turning this

7    into a hypothetical at this point.  So, I don't

8    think you should delay, but, I mean, if I'm the

9    closest, I'm going to be there first, yeah,

10   code three.  If the squad's there, they're

11   administering life-saving techniques, I'm very

12   far away, I'm not going to delay in getting

13   there but does it warrant a code three response

14   down Reed Hartman Highway with thousands and

15   thousands of people, I mean I -- it's a

16   judgment call at that point.

17        MR. GERHARDT:  If that call was for a

18   non-breather unrelated to Narcan, would you

19   change your position on that?

20        MR. ROCKEL:  A non-breather, 70-year old

21   hospice patient --

22        MR. GERHARDT:  Let's just say at Frisch's

23   it's a non-breather.

24        MR. ROCKEL:  Okay.

Exhibit 7B
Dane Baumgartner

1

- - - - -

TAPED INTERVIEW OF DANE BAUMGARTNER

Monday, July 16, 2018

9:58 a.m. until 10:38 a.m.

Blue Ash Police Department

4343 Cooper Road

Cincinnati, Ohio 45242

- - - - -

PRESENT DURING INTERVIEW:

Lt. Roger Pohlman

Lt. Robert Gerhardt

- - - - -

ARMSTRONG AND OKEY, INC.

222 East Town Street, Second Floor

Columbus, Ohio 43215

(61) 224-9481  -  (800) 223-9481

Dane Baumgartner

6

1   26th at the Frisch's on Plainfield Road.

2       MR. BAUMGARTNER:  Okay.

3       MR. POHLMAN:  The nature of it was a squad

4   run.

5       MR. BAUMGARTNER:  Yep.

6       MR. POHLMAN:  You were working that day.

7   Do you remember that detail?  If so, can you

8   tell me the circumstances of the dispatch of

9   that detail.

10      MR. BAUMGARTNER:  If I remember it as

11  the -- the person who was a non-breather in the

12  restroom of Frisch's.

13      MR. POHLMAN:  Yeah, that's -- that's the

14  one I'm referring to.

15      MR. BAUMGARTNER:  Yeah, I do remember

16  that.  I remember that it came out -- I know

17  it -- I thought it came out as a person

18  unconscious, unresponsive, but I'm not -- not

19  positive.  But, I know at some point it was

20  upgraded as a non-breather is how it came out

21  to what I recall.

22      MR. POHLMAN:  Do you remember any other

23  details of that call of how it was dispatched

24  out other than what you've already told us?

Dane Baumgartner

15

1  Obviously that policy can't outline every

2  single type of call but you said -- I don't

3  want to put words in your mouth.  What -- I

4  mean, what does the policy say with that type

5  of call?  What do you think?

6      MR. BAUMGARTNER:  I mean, our duty is to

7  preserve life and, you know, this is obviously

8  a run where there's a life in peril that we

9  have an obligation and duty to protect and

10  that's -- given that, it's -- you know, a

11  person not breathing is an emergency and I

12  think we need to get there quickly and

13  obviously safely.  Being a driving instructor

14  and things, obviously we shouldn't be putting

15  ourselves in inherent danger.  We have to do

16  due regard to get there, but at the same time I

17  think it requires a speedy response in the best

18  of our ability.

19      MR. POHLMAN:  Do you think that our policy

20  is specific on -- on -- you defined it as an

21  emergency response.  Do you think that our

22  policy says what we should do if it's an

23  emergency response?

24      MR. BAUMGARTNER:  Yes.  But, I mean, I

Exhibit 7C
Jim Kelley

1

- - - - -


TAPED INTERVIEW OF JIM KELLEY

Tuesday, July 17, 2018

7:34 a.m. until 7:58 a.m.

Blue Ash Police Department

4343 Cooper Road

Cincinnati, Ohio 45242


- - - - -


PRESENT DURING INTERVIEW:

Lt. Roger Pohlman

Lt. Robert Gerhardt

William Fritts, Union Representative


- - - - -


ARMSTRONG AND OKEY, INC.

222 East Town Street, Second Floor

Columbus, Ohio 43215

(61) 224-9481  -  (800) 223-9481

Jim Kelley

8

1   your detail.

2        MR. KELLEY:  Okay.  Like I said, I don't

3   know why I would -- I'm not remembering if it

4   was my detail.  I have no idea.

5        MR. POHLMAN:  No, this was not your

6   detail.

7        MR. KELLEY:  Okay.

8        MR. POHLMAN:  You were working that day.

9   I was just seeing if you remember that detail.

10        Have you -- has your shift received any

11   direction as far as policy from any Blue Ash

12   supervisor?  Like, I know your direct

13   supervisors are Sergeant Schlee (phonetic) and

14   Sergeant Charron.

15        MR. KELLEY:  Yes.

16        MR. POHLMAN:  But sometimes you'll have

17   other sergeants comes in and work different

18   shifts.  Have you guys got any direction from

19   any of your supervisors about -- specifically

20   about responding, response policy of like how

21   you should respond to calls?

22        MR. KELLEY:  Other than we were to respond

23   to calls.  That was it.  No.

24        MR. POHLMAN:  No -- no like shift rules or

Jim Kelley

9

1   expectation of how you should respond to calls

2   code three or not code three or different --

3        MR. KELLEY:  No.

4        MR. POHLMAN:  Nothing like that.

5        Okay.  Do you have any questions, Rob?

6        MR. GERHARDT:  Yeah.  When is the last

7   time you were on an investigative call where

8   someone died?

9        MR. KELLEY:  Died and stayed dead or died

10  and brought back?

11       MR. GERHARDT:  Either one.

12       MR. KELLEY:  Last week.  OD, double OD

13  down at the -- down at the nursing home.  They

14  brought one guy right away, another one coded

15  and they had to -- they were doing CPR and full

16  code on him for quite a while and brought him

17  back.

18       MR. GERHARDT:  This was -- this was at the

19  nursing home.

20       MR. KELLEY:  Yeah.  Aptec (phonetic) and

21  Lilly were the two patients' names.  Apted

22  (phonetic).  I'm sorry, Apted.

23       MR. GERHARDT:  That was a week ago.

24       MR. KELLEY:  It was, I don't know,

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

Jim Kelley

11

 1   remember which medic it was.  He went in with

 2   him to start giving treatment.  And I went back

 3   to Apted and the other medic that was still

 4   waiting in the hallway to get his information.

 5   Because they were working on the other guy, I

 6   had no idea who that was yet, so I figured

 7   I'm -- I'm going to have to do at least one

 8   report, if not two.  So, I got the information

 9   from Apted what's going on with this and put

10   out the call for assistance and everybody else

11   showed up.  You showed up, Bouyatte (phonetic),

12   the whole squad showed up and they brought the

13   other guy back.

14        MR. GERHARDT:  How did you respond to that

15   run?  Were you in emergency response with --

16        MR. KELLEY:  No.

17        MR. GERHARDT:  -- lights and sirens

18   activated?

19        MR. KELLEY:  No, because it only came out

20   as a male 50 unresponsive.  They didn't put

21   anything out about DOA or overdose or nothing.

22   It was just male unresponsive, and I typically

23   don't run code three to a male unresponsive if

24   I -- one, if I know the squad's going to beat

Jim Kelley

12

1   me there anyway, and traffic is heavy in Blue

2   Ash during the day shift and why put myself in

3   that position.

4        MR. GERHARDT:  When's the last time you

5   responded to a Narcan overdose where the male

6   was non-breather?

7        MR. KELLEY:  Other than the one I just

8   spoke about?  I --

9        MR. GERHARDT:  Did the call get changed to

10  a non-breather --

11       MR. KELLEY:  No.

12       MR. GERHARDT:  -- at some point in time?

13       MR. KELLEY:  No.  I really don't know.  I

14  can't recall any specific dates.

15       MR. POHLMAN:  Do you know the last time

16  you went code three to a call besides the --

17  did you already say the --

18       MR. KELLEY:  Yes.  A guy -- guy's wife

19  called in here.  She was panicked and screaming

20  that her husband was having a heat stroke and

21  he was somewhere at Ethicon and that was on

22  Saturday, this past Saturday.  I was at Reed

23  Hartman and Carver when it came out.  He was

24  having a heat -- the details given to me were

Exhibit 7D

Ed Charron

1

- - - - -

TAPED INTERVIEW OF ED CHARRON

Wednesday, August 1, 2018

8:01 a.m. until 8:42 a.m.

Blue Ash Police Department

4343 Cooper Road

Cincinnati, Ohio 45242

- - - - -

PRESENT DURING INTERVIEW:

Lt. Roger Pohlman

Lt. Robert Gerhardt

Rick Paquette, Union Representative

- - - - -

ARMSTRONG AND OKEY, INC.

222 East Town Street, Second Floor

Columbus, Ohio 43215

(61) 224-9481   -   (800) 223-9481

Ed Charron

26

1   wouldn't it be everyone going code three if --

2   under your logic that you're proposing.

3       MR. GERHARDT:  Why wouldn't other people

4   go code three?

5       MR. CHARRON:  Because we've never gone

6   code three to a squad run.  It's not --

7       MR. GERHARDT:  That's okay.

8       MR. CHARRON:  (Inaudible statement.)

9       MR. GERHARDT:  I'm not talking to a squad

10  run.  I'm talking about a non-breather.  Did

11  any of your other officers that day go in

12  emergency response?

13      MR. CHARRON:  Not that I'm aware of.

14      MR. GERHARDT:  Did you ever key up to see

15  if any other officers were closer than you that

16  may be able to go in emergency response and

17  assist the other officer?

18      MR. CHARRON:  No.

19      MR. GERHARDT:  Is that a part of your job

20  duties as a supervisor?

21      MR. CHARRON:  I don't know.

22      MR. GERHARDT:  You don't know if it's a

23  part of your job duties as a supervisor to

24  either increase the level of response to an

Exhibit 7E
Gary McNeal

1

- - - - -


TAPED INTERVIEW OF GARY MCNEAL

Friday, July 20, 2018

12:00 p.m. until 12:27 p.m.

Blue Ash Police Department

4343 Cooper Road

Cincinnati, Ohio 45242


- - - - -


PRESENT DURING INTERVIEW:

Lt. Roger Pohlman

Lt. Robert Gerhardt

Brendan McKinney, Union Representative

Jessup Gage, Esq., on behalf of Gary McNeal


- - - - -


ARMSTRONG AND OKEY, INC.

222 East Town Street, Second Floor

Columbus, Ohio 43215

(61) 224-9481  -  (800) 223-9481

Gary McNeal

8

1  MR. MCNEAL: I know the Chief was there,

2 and I -- well, the squad, fire personnel were

3 there, and I want to say Dane was there --

4  MR. POHLMAN: Okay.

5  MR. MCNEAL: -- if -- if I recall

6 correctly.

7  MR. GERHARDT: How do you know that those

8 people were there before you?

9  MR. MCNEAL: Well, they were there when I

10 got there and --

11  MR. GERHARDT: Did you hear anyone on the

12 radio come across saying they were on scene?

13  MR. MCNEAL: I think so. Yeah, I think

14 so.

15  MR. POHLMAN: Do you have any idea of how

16 long you think it took you to get there?

17  MR. MCNEAL: I want to say about maybe ten

18 minutes.

19  MR. POHLMAN: Do you think that's

20 appropriate or acceptable based on this being

21 an emergency call?

22  MR. MCNEAL: I think it was acceptable

23 being that I heard people arrive at the scene

24 before me, and the traffic conditions, and from

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481



# Exhibit 8

**CITY OF BLUE ASH**

POLICE DEPARTMENT

Interdepartmental
Memorandum

October 2, 2018

To: David Waltz, City Manager

From: Chief Scott D. Noel, Police Chief

Copies:

Subject: Recommendation – Internal Investigation IA-18-001 of Patrol Officer Gary McNeal

On July 5, 2018, I ordered Lt. Pohlman and Lt. Gerhardt to conduct an internal investigation concerning the response time and response mode of Blue Ash Police Officers who responded to a call for service at Frisch's located at 9070 Plainfield Road for a non-breather. On September 7, 2018, Lt. Pohlman provided me with a copy of IA-18-001. I have carefully and thoroughly reviewed IA-18-001 and all supporting materials. Having reviewed the report, I concur with the factual conclusions and recommendations. I recommend that P.O. McNeal be terminated for:

> Violation 1: Failing to properly respond to an emergency call in violation of Blue Ash Policy 308.2, 308.4(b), 319.2, 319.4, 319.5.1 (a)(c), 319.5.7(i), 319.5.9(m), 319.5.10(f); Blue Ash Codified Ordinance 135.10(b)(f)(k)(x)(y); Ohio Revised Code 4511.041, 4511.21, 4511.42, 4511,25.

> Violation 2: Violating traffic laws while not under lights and siren (code 3) in violation of Blue Ash Police Policy 308.2, 308.4(b)(c) and 319.2, 319.4, 319.5.1(a)(c), 319.5.7(b), 319.5.8(i), 319.5.9(m), 319.5.10(f), Ohio Revised Code 4511.041, 4511.21, 4511.25, 4511.42 and Blue Ash Codified Ordinance 135.10(f), (k), (x).

> Violation 3: Failing to be familiar with department policy in violation of policy 103.1, and 319.2, 319.4, 319.5.1(a)(c), 319.5.7(b); Blue Ash Codified Ordinances 135.10(f)(k)(x).

> Violation 4: Failing to properly check and utilize Mobile Audio Video in violation of Blue Ash Police Policy 423.2, 423.3, 423.4, 423.4.1, 319.3, 319.4, 319.5.1(a)(b)(c), 319.5.7(a)(b)(c), 319.5.8(i); Blue Ash Codified Ordinances 135.10 (b)(e)(f)(k)(x)(y).

> Violation 5: Untruthfulness during an investigative interview in violation of Blue Ash Policy 319.2, 319.3, 319.4, 319.5.1(a)(b)(c), 319.5.2(g), 319.5.7(c), 319.5.8(a)(c)(e)(i), 319.5.9(h)(m); Blue Ash Police Department Law Enforcement Code of Ethics; Blue Ash Codified Ordinance 135.10(b)(e)(k)(x)(y); and P.O. McNeal's Oath of Office.

At the conclusion of this internal investigation, Lt. Pohlman and Lt. Gerhardt recommended that P.O. McNeal be terminated. The recommendation took into account the causative factors of the

offenses, the severity of the offenses, and prior discipline involving Officer McNeal. After a careful and thorough review of all information contained within this internal investigation, I concur and recommend that Officer McNeal's employment with the City of Blue Ash Police Department be terminated for the reasons set forth in the Report and Violations set forth above. Termination is warranted because, during the course of this internal investigation, P.O. McNeal made at least two untruthful statements. The fundamental foundation for a law enforcement officer is truthfulness. This characteristic is perhaps the most essential element for a law enforcement officer to be able to do his/her job. P.O. McNeal signed an oath of office on July 16, 2001. One of the things he solemnly affirmed was to honestly discharge his duties as a police officer. By not being truthful during this internal investigation, P.O. McNeal violated his oath of office.

Not only do these numerous violations warrant termination in their own right as violations of the respective rules and ordinances as cited in the Internal Investigation report, this conduct also reflects on McNeal's ability to testify truthfully as a witness in future cases brought by the prosecutor's office. These violations hinder his ability to perform the essential functions of his job. As a result of the Supreme Court's decision in Brady v. Maryland, 373 U.S. 83 (1963), prosecutors are required to notify defendants in criminal cases or their attorneys of evidence in their possession bearing on a law enforcement official's credibility if he is called as a witness. The Supreme Court requires prosecutors to learn of and then disclose to defense attorneys information which will be used to impeach law enforcement witnesses in criminal cases. This would include previous lying or false statements made by the law enforcement officer. Testifying in court proceedings is an important part of a police officer's duties after he makes an arrest.
The Blue Ash Police Department would be required to report McNeal's failure to be truthful in the internal investigation. (Attachment A—Letter from Prosecutor Deters). Part of McNeal's job duties include his ability to testify truthfully in any matters brought by the prosecutor's office involving the City of Blue Ash Police Department. Should the prosecutor want to use McNeal as a witness in any future proceedings, his failure to testify truthfully in the above-mentioned instances mandates that the prosecution notify defense counsel of this behavior. This seriously damages his credibility as a witness, which inhibits his ability to perform his essential job duties. Moreover, the violations are simply unacceptable in a police department, as McNeal has violated the public trust as well as the department's trust in him.

I also examined the severity of P.O. McNeal's conduct. P.O. McNeal and Sgt. Charron were dispatched to a reported possible drug overdose. The detail was quickly upgraded to a non-breather. I can think of no bigger emergency, warranting an immediate response, than a report that someone has stopped breathing. P.O. McNeal was provided this information and he was the primary car dispatched.

Instead of expediting his response to the scene, using all available resources at his disposal to get there quickly and safely, P.O. McNeal chose to nonchalantly go to his patrol vehicle, delay his response leaving the police department for an unexplained reason. And he did not use his emergency equipment to respond to the highest priority call. In purposefully delaying or not expediting his response, he failed his duties of trying to protect/save a life, the highest priority for a police officer. Even more shocking, P.O. McNeal believes this conduct was proper and that he did nothing wrong, except in the eyes of those investigating and examining this incident.

During the course of this internal investigation, it was discovered that P.O. McNeal repeatedly and purposefully violated the Blue Ash Police Department's cruiser camera policy and was untruthful when asked about that conduct. Specifically, from January 1, 2018 through July 15, 2018, P.O. McNeal worked a total of 109 days. P.O. McNeal violated the policy regarding properly checking the in car camera at the beginning of his shift on all 109 days. In addition to this daily policy violation, P.O. McNeal also violated the policy requiring the use of a microphone in conjunction with the in car camera on 29 of the 37 traffic stops he made during the same time period. P.O. McNeal acknowledged that he had been previously disciplined for not using the in car camera system. These violations show a clear pattern of willful misconduct.

Finally, I also examined P.O. McNeal's disciplinary record, particularly the specific discipline he has been issued within the last two years. Over the course of the last two years, P.O. McNeal has received five official disciplinary actions. This is the sixth. Those disciplinary actions include: one Documented Oral Reprimand, one Written Reprimand, and three separate suspensions without pay. These suspensions without pay include a one day suspension, a three day suspension, and a four day suspension. P.O. McNeal has previously been advised that continued and/or repeated violations of the same policies would result in progressive discipline up to and including termination. The above listed disciplinary actions all deal with incompetency, failure to follow instructions, and failure to follow department policies. P.O. McNeal has repeatedly displayed his indifference to department rules and/or policies and procedures. Allowing P.O. McNeal to continue to be employed as a police officer for the City of Blue Ash would send the wrong message to other members of the department, namely that they to only have to follow those policies with which they agree and that not following policy has no consequences or resulting accountability.

Accordingly, I recommend that P.O. McNeal's employment be terminated.

Scott D. Noel



**Exhibit 9A**

***BLUE ASH POLICE DEPARTMENT***

4343 Cooper Road
Blue Ash, Ohio 45242
513.745.8555

## Documented Counseling

*Kelley, McNeal, Simon,*
*Burrell, Degenhardt*                              2-21-17
_____          _____          _____
**Officer**                                   **Badge #**                    **Date of Counseling**


*Noteworthy:*    ☒    *Corrective:*    ☐


**Supervisor's Narrative of Incident and Counseling:**


I am writing this noteworthy to bring to your attention the outstanding professionalism displayed by the following Police and Fire personnel:

Officer Kelley, Officer McNeal, Firefighter Lt. Simon, Firefighter Burrell, Firefighter Degenhardt.

On 2-21-17, Pamet incident # 17-336, the above listed personnel responded for a subject at Easter Seals at 9015 Rossplain rd out of control and being held down by four staff members.

All of the employees that responded put into action their CIT training skills. They were safe in their tactics, compassionate, understanding, friendly, patient, and in the end were able to gain the trust and compliance of the subject who was experiencing a mental crisis.

Their actions reflected positively on our City and their respective departments. I commend them and thank them for their actions.

**Attach additional narratives or supporting documentation:**
*Officer's response or comments: (to be completed by the Supervisor)*




*Supervisor* _____
*Forward copy of all documented counseling to the Patrol Section Lt.*

*Lt. Review* _____          *Date:* _____



**Exhibit 9B**

*BLUE ASH POLICE DEPARTMENT*

4343 Cooper Road
Blue Ash, Ohio 45242
513.745.8555

## Documented Counseling

McNeal ✓

**Officer**

449

**Badge #**

*4-8-2017*

**Date of Counseling**

*Noteworthy:* ☒     *Corrective:* ☐

**Supervisor's Narrative of Incident and Counseling:**

Dispatcher Miller received a complimentary call from Carol Honsaker about Officer McNeal. Mrs. Honsaker praised McNeal who took her theft report, 17-631, and she said he was kind and polite and took her report seriously.

**Attach additional narratives or supporting documentation:**
*Officer's response or comments: (to be completed by the Supervisor)*

**Supervisor** _____

*Forward copy of all documented counseling to the Patrol Section Lt.*

**Lt. Review** _____     Date: __4-8-2017__

BARD STFPS



**BLUE ASH POLICE DEPARTMENT**

Exhibit 9C

4343 Cooper Road
Blue Ash, Ohio 45242
513.745.8555

## Documented Counseling

*Officer McNeal*  ✓                    *4009*                    *04/20/ 2017*
**Officer**                          **Badge #**               **Date of Counseling**


*Noteworthy:*   x    *Corrective:*   ☐


**Supervisor's Narrative of Incident and Counseling:**


*On April 20, 2017, Blue Ash Officers were dispatched to a 3 car accident with injuries, in the area of Plainfield and Hunt. The striking vehicle was described as a maroon Chevy Trailblazer that had left the scene.*

*Officer McNeal immediately responded to Reed Hartman Hgwy, north bound, in an attempt to locate this vehicle. His diligent efforts brought him to the BP gas station on Pfeifer, where he located a vehicle matching the description.*

*After a brief investigation it was determined this was the striking vehicle. The operator was cited for ACD and Hit/Skip. This brought the event to a close.*

*I was at the scene of the accident where drivers of the other vehicles were still onscene. These operators were elated to hear the vehicle and driver were located and commented on what a great job our police department had done.*

*Officer McNeal should be recognized for his diligent efforts in locating this driver.*

*A job well done!*


**Attach additional narratives or supporting documentation:**
*Officer's response or comments: (to be completed by the Supervisor)*

**Supervisor** _____   4.21.17

*Forward copy of all documented counseling to the Patrol Section Lt.*

**Lt. Review** _____      **Date:** _4-21-17_

 

**Exhibit 9D**

4343 Cooper Road
Blue Ash, Ohio 45242
513.745.8555

## *Documented Counseling*

*Officer(s):*
McNeal, Gary

*Date of Counseling:*
Thursday, October 19, 2017

*Noteworthy* ☑    *Corrective* ☐

### *Supervisor's Narrative of Incident and Counseling:*

Mr. McCann emailed our police department to commend Officer McNeal. Mr. McCann sent the following:

"I would like to inform someone of a great interaction I had with a Blue Ash officer. I was involved in an accident on 10/11/17 and officer McNeal came to the scene. He was very kind and courteous. Having an accident is never a good thing but he handled the scene very well. I appreciate his kindness and professionalism."

Thank you,
Joe McCann

Joseph A. McCann | Lead Patient Advocate
Offic███████████ | Fax 513 862 7050

Officer McNeal is commended for this action, and it is reflective of his service to our customers in all situations that I have witnessed as his Sergeant. Thank you.

### *Attach additional naratives or supporting documentation:*

*Supervisor* _____     *Date* /O – /9-/7

*Forward copy of all documented counseling to the Patrol Section Lt.*





**Exhibit 9E**
4343 Cooper Road
Blue Ash, Ohio 45242
513.745.8555

## *Documented Counseling*

*Officer(s):*
McNeal, Gary

*Date of Counseling:*
Saturday, November 04, 2017

*Noteworthy* ☑   *Corrective* ☐

### *Supervisor's Narrative of Incident and Counseling:*

On 11-4-17 Blue Ash Officers were dispatched to the Blue Ash Nursing home for a 71 year old assaulting staff. Upon arrival Officers were told that the 71 year old was in declining health, refusing to eat or take his medicine and acting violently. The nursing supervisor had already called the BAFD and had made arrangements for the 71 year old to be admitted at UofC for a physical and mental evaluation.

While Officers were trying to get the 71 year old to comply and get on the medical gurney for transport he began assaulting the fire personnel as they attempted to put him on the gurney. Officer McNeal, who had recently been trained to deal with veterans in this type of crisis, learned that the 71 year old was a former Marine Corps veteran. Officer McNeal applied his training and began working on making a bond with the 71 year old by highlighting his respect for his service and asking him questions about his service. This worked and the 71 year old became compliant and fire personnel were able to transport him without any further issues.

The nursing supervisor was so impressed that he commented on what a good job Officer McNeal had done in getting the 71 year old to calm down.

Officer McNeal is commended for his quick thinking, applying his training, his compassion and empathy.

### *Attach additional naratives or supporting documentation:*

**Supervisor** _____     *Date* __11 - 12 - 17__

*Forward copy of all documented counseling to the Patrol Section Lt.*

**Exhibit 10**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

08 AUG 28 PM 2: 17

| | | |
|---|---|---|
| DARYL BLACK<br>8303 Kenwood Road, Apt. 5<br>Cincinnati, OH 45236 | : | |
| | : | Case No. **1:08CV584** |
| PLAINTIFF | : | Judge ___SPIEGEL, J.___ |
| v. | : | |
| CITY OF BLUE ASH<br>4343 Cooper Road<br>Blue Ash, OH 45242 | : | |
| | : | COMPLAINT WITH JURY DEMAND |
| and | : | |
| SCOTT NOEL, individually and in his<br>capacity as a Blue Ash Police Officer | : | |
| c/o Blue Ash Police Department<br>4343 Cooper Road, Blue Ash, OH 45242 | : | |
| | : | |
| DEFENDANTS | : | |

Comes Plaintiff, Daryl Black, by and through counsel, and for his Complaint, states as follows:

## I. JURISDICTION

1. Jurisdiction over the federal civil rights claims is conferred on this Court by 28 U.S.C. §§1331 and §§1343(3) and (4). Jurisdiction over the state law claims is conferred by 28 U.S.C. §1367(a). Venue is proper in this Division.

## II. PARTIES

2. Plaintiff Daryl Black is an individual who at all times relevant hereto has been a citizen and resident of the State of Ohio.

1

3.     Defendant City of Blue Ash, Ohio is a unit of local government organized under

the laws of the State of Ohio.

4.     Defendant Scott Noel is a law enforcement officer state employed by the City of

Blue Ash and at all times relevant to this action acted under color of law. He is sued individually

and in his official capacity.

## III. FACTS

### A.     The vehicle operated by Charles Wayne Bennett, in which Plaintiff Daryl Black was a passenger, never attempted to ram Defendant Noel

5.     On August 28, 2007, Charles Wayne Bennett (hereinafter referred to as "Bennett")

was driving a black Monte Carlo on Cornell Road in which Plaintiff Daryl Black was a

passenger.

6.     Bennett drove eastbound on Cornell Road and commenced to turn the car around.

7.     Defendant Noel encountered Bennett and videotaped the Monte Carlo as it

changed direction.

8.     It is evident from the cruiser video that there was a passenger, namely Plaintiff

Daryl Black, in the Monte Carlo.

9.     Defendant Noel commenced pursuit of Bennett at high speed.

10.     Defendant Noel communicated over dispatch radio, to all available officers, that

"I just had a vehicle try to ram me." That statement was false.

### B.  Defendant Noel lied to justify his high speed pursuit

11.     Under Blue Ash Police department policy 12.045, "officers must terminate their

involvement in motor vehicle pursuits whenever the risks to their safety and others outweigh the

2

consequences of the suspect's escape." The policy also states, "The intent of the policy is to restrict vehicle pursuits to those situations and circumstances in which immediate apprehension outweighs the hazard generated to the officer, public or occupants of vehicle."

12.     Under the policy, "the primary goal of law enforcement is the protection of life and property. If a motor vehicle pursuit exposes any officer, member of the public or suspect to unnecessary risk, pursuit is inconsistent with that goal and should be terminated."

13.     Under this policy, Defendant Noel was required to "weigh the risk of danger" to Mr. Bennett, his passenger Mr. Black, any pedestrians in the area, and himself, "against the crime" of a traffic violation.

14.     Bennett's traffic violation did not justify a high speed pursuit under the Blue Ash Police Policy on high speed pursuits.

15.     Defendant Noel knew that Mr. Bennett's traffic violation would not justify a high speed pursuit under the Blue Ash police policy.

16.     The high speed pursuit policy did support pursuit in circumstances 'where the suspect knowingly attempted to ram a police officer, because the "nature/seriousness of the suspected crime" would weigh heavily against the risk of danger.

17.     Defendant Noel communicated the false allegation so that he would appear justified under the Blue Ash police policy to continue his pursuit.

**C. Noel Made Further False Allegations about Bennett**

18.     Defendant Noel knowingly elicited participation by other officers in the pursuit of Mr. Bennett based on his false claim that Mr. Bennett attempted to ram him.

19.     Defendant Noel also reported that "I am going to take this guy out if I get a

3

chance."

20.     The officer in command, Officer Hartinger, relied on Noel's false statement that Mr. Bennett had tried to ram Defendant Noel and verbally agreed that Defendant Noel should "take him out."

21.     Defendant Noel subsequently communicated during the pursuit that Mr. Bennett "almost tried to ram me three times." This statement was also false.

### D. Noel's False Claims Caused Blue Ash Officers to Kill Charles Wayne Bennett

22.     Other Blue Ash police officers heard Noel's communication that someone had tried to ram Defendant Noel.

23.     The Blue Ash officers joined in the pursuit and used deadly force during the chase in reliance on the false statement that Bennett had tried to ram Defendant officer Noel.

24.     Mr. Bennett was shot six times by the Blue Ash officers. Mr. Bennett was not armed.

25.     Mr. Bennett died as a result of the shooting. Mr. Black was not struck by the bullets, but was in the enclosed car with Mr. Bennett during the shouting barrage and was placed in grievous harm by the officers wrongful actions.

26.     The use of force against Charles Wayne Bennett, in close proximity to Mr. Black created a danger of grievous and deadly harm to Mr. Black which was excessive and completely unnecessary.

### E. Policies and Practices, Abuse of Power

27.     Defendant Scott Noel has acted negligently, intentionally, recklessly, and with deliberate indifference to the constitutional rights of Mr. Black.

4

28.     The actions of the Defendants reflect an arbitrary abuse of government power, which shocks the conscience.

29.     The actions of Defendants were the moving force behind the constitutional violations suffered by Mr. Black.

30.     Although Defendant, the City of Blue Ash, was on notice of the obvious need to train and supervise defendant Noel, due to prior incidents, it failed to take any corrective supervisory action. Defendant Noel engaged in a pattern and practice of reckless behavior. As such, Defendant City of Blue Ash was deliberately indifferent to the rights of citizens subject to search and seizures, including Mr. Black.

31.     Defendant City of Blue Ash ratified the constitutional violations by Defendant Noel and covered up the truth regarding the decision to use deadly force against Mr. Bennett and by implication against Mr. Black.

## IV.  FIRST CLAIM FOR RELIEF - §1983

32.     The Defendants have, under color of state law, deprived Plaintiff of clearly established rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution of which a reasonable person would have known. These rights include, but are not limited to, the right to due process of law, the right to be free of unreasonable searches and seizures, and the right to be free of excessive force.

## V.  SECOND CLAIM - STATE LAW CLAIM FOR ASSAULT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

33.     That the afore described wrongful actions of the Defendants constituted assault and the intentional infliction of emotional distress against Mr. Black resulting in injury and

5

damage to Mr. Black as described below.

## VI. THIRD CLAIM - INJURIES AND DAMAGE

34.    As a result of the wrongful actions of the Defendants, Plaintiff Daryl Black

sustained physical injury, severe emotional distress, has in the past and will in the future incur

medical expenses for the treatment of his aforementioned injuries, has in the past and will in the

future suffer destruction of his income earning capacity, and has in the past and will in the future

sustain great pain and suffering, including the loss of enjoyment of life and the increased

likelihood of future complications all to his damage and detriment.

WHEREFORE, Plaintiff prays as follows:

A.    For compensatory damages against Defendants in an amount to be shown at trial;

B.    For punitive damages in an amount to be shown at trial;

C.    For his reasonable attorneys' fees pursuant to 4 U.S.C. §1988 and any other

applicable law;

D.    For pre-judgment interest and post-judgment interest; and,

E.    For all other relief to which Plaintiff may appear entitled.

s/Harry D. Rankin
Harry D. Rankin Oh Reg. No. 0065855
Sutton Rankin Law, PLC
130 Dudley Road, Suite 250
Edgewood, Kentucky 41017
(859) 331-8883
Fax (859) 341-2777
E-mail: hrankin@suttonrankinlaw.com

6

*DEMAND FOR JURY TRIAL*

The Plaintiff Daryl Black demands a trial by jury.

/s/Harry D. Rankin

Harry D. Rankin

7